**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 210116-U

Order filed August 6, 2021

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| *In re* D.W., D.W., and S.W., | ) | Appeal from the Circuit Court |
| | ) | of the 14th Judicial Circuit, |
| Minors, | ) | Henry County, Illinois, |
| | ) | |
| (The People of the State of Illinois, | ) | Appeal Nos. 3-21-0116, 3-21-0117, |
| | ) | and 3-21-0118 (Consolidated) |
| Petitioner-Appellee, | ) | Circuit Nos. 18-JA-17, 18-JA-18, and |
| | ) | 18-JA-19 (Consolidated) |
| v. | ) | |
| | ) | |
| Jesse W., | ) | Honorable |
| | ) | Terence M. Patton, |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE WRIGHT delivered the judgment of the court.
Presiding Justice McDade and Justice Holdridge concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The circuit court properly denied father's motion for substitution of judge and motions to continue the best interest hearing. The circuit court's decisions, first finding father unfit, and then terminating father's parental rights, are affirmed.

¶ 2     Respondent father, Jesse W., appeals from orders of the circuit court terminating his

parental rights. Father challenges the court's denial of his motion for substitution of judge and

motions to continue the best interest hearing, together with the circuit court's fitness and best interest findings. We affirm.

¶ 3                                   I. BACKGROUND

¶ 4        Before recounting the proceedings that led to the termination of father's parental rights, it may be helpful to briefly explain the procedural posture of the instant appeal. In this case, the circuit court terminated both mother and father's parental rights to three children, Da.W., Dy.W., and S.W., whose cases had been previously consolidated into one proceeding in the circuit court. Mother and father filed joint notices of appeal in Henry County case Nos. 18-JA-17, 18-JA-18, and 18-JA-19, resulting in six appeals in this court, appeal Nos. 3-21-0110, 3-21-0111, 3-21-0112, 3-21-0116, 3-21-0117, and 3-21-0118. This court subsequently consolidated the first three appeals, pertaining to the termination of mother's parental rights, and designated the consolidated appeal as appeal No. 3-21-0110. This court consolidated the remaining three appeals, pertaining to the termination of father's parental rights, and designated the second consolidated appeal as appeal No. 3-21-0116. Mother and father are represented by different counsel on appeal and have submitted separate briefs for this court's consideration. This order addresses the facts, procedural history, and issues raised pertaining to the termination of father's parental rights alone.

¶ 5                                 A. Neglect Petitions

¶ 6        On April 16, 2018, the State filed three petitions for adjudication of wardship (neglect petitions) alleging siblings Da.W. (D.O.B. 1/03/2009), Dy.W. (D.O.B. 11/14/2011), and S.W. (D.O.B. 12/16/2017) were neglected due to an environment injurious to their welfare pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (the Act). 705 ILCS 405/2-3(1)(b) (West 2018). The neglect petitions pertaining to Da.W. and Dy.W. contain nearly identical allegations.

These allegations are summarized below in subsection 1. The neglect petition pertaining to S.W. is summarized separately in subsection 2.

¶ 7                                            1. Neglect Petitions (Da.W./Dy.W.)

¶ 8        The neglect petitions alleged mother and father were evicted from a residence shortly before the initiation of these proceedings by the State in April 2018. Officers from the Geneseo Police Department were present at the time of the eviction and observed the minors at the home without parental supervision. The officers discovered that an older sibling, who is not the subject of this appeal, was present on the property with a sawed-off shotgun and several pocketknives in his possession. The officers learned that mother had not been in the home in the last three days prior to the eviction. According to the officers, the home was in shambles, with holes in the walls and broken windows.

¶ 9        A Department of Children and Family Services (DCFS) investigator made contact with mother at a trailer court in Kewanee, Illinois, on April 12, 2018. The neglect petitions alleged that Michael Crowder was present with mother at the Kewanee address when the investigator arrived. Crowder had a prior conviction for aggravated criminal sexual abuse. When the investigator advised mother that he was there to assess the well-being of her children, mother evaded the investigator's welfare check by removing the children from that location. With the assistance of law enforcement, the minors were located several hours later.

¶ 10       Eventually, Da.W. and Dy.W. were examined by staff at a local hospital. The children were filthy, were not wearing underwear and were diagnosed with having scabies, lice, and bed bugs. The neglect petitions alleged Da.W. and Dy.W. were either not enrolled in school or had missed a significant number of days of school and school officials were unaware of the family's place of residence.

¶ 11　　　　Lastly, the petitions alleged father directed Da.W. and Dy.W.'s older siblings to steal food items from a local Save-A-Lot store. Father was subsequently charged with retail theft and contributing to the delinquency of a minor.

¶ 12　　　　　　　　　　　　　2. Neglect Petition (S.W.)

¶ 13　　　　The neglect petition pertaining to S.W. provided that S.W. was born in December 2017 and was approximately four months of age when the neglect proceedings began. According to the neglect petition, S.W.'s mother and father had no current residence and had been staying for short periods of time at various addresses in the Kewanee area, as well as in the states of North Carolina, Louisiana, and Texas.

¶ 14　　　　In April 2018, mother reported to DCFS that S.W. was being cared for by a person named "Rachel," who lived on Boss Street in Kewanee. However, mother refused to provide, or did not know, Rachel's last name or address but told DCFS that mother had known Rachel for her entire life. Kewanee officers eventually located S.W. in the care of Paige Garrigan at a home located on Rose Street in Kewanee. DCFS also discovered a live shotgun round and a small butane torch in S.W.'s diaper bag. The neglect petition pertaining to S.W. contained the same allegations regarding the criminal charges levied against father.

¶ 15　　　　　　　　　　　　　B. Adjudicatory Hearing

¶ 16　　　　On September 26, 2018, the circuit court conducted an adjudicatory hearing. Father was not present. Father was presumably incarcerated in North Carolina at that time. The court remarked that neither parent had "been here for a while" and "obviously have shown no intent on appearing here." The court concluded father voluntarily chose not to appear or participate in the adjudicatory hearing. The adjudicatory hearing took place, without objection, in father's absence. At the conclusion of the adjudicatory hearing, the court found the State's evidence was sufficient

4

to prove the allegations contained in all three neglect petitions, except for the allegation regarding retail theft. All three minors were adjudicated to be neglected due to an injurious environment.

¶ 17                               C. Dispositional Hearing

¶ 18          The dispositional hearing took place on November 14, 2018. The dispositional hearing was conducted in father's absence, without objection, due to father's incarceration in North Carolina. At the conclusion of the hearing, the court entered dispositional orders finding father unfit based on the contents of the neglect petitions and due to father's current, ongoing, incarceration. The court made the minors wards of the court and set a permanency goal of returning home within 12 months. The court ordered father to cooperate with DCFS, comply with the terms of the DCFS service plan, and correct the conditions that brought the minors into care.

¶ 19          The DCFS service plan submitted to the court required that father provide DCFS with medical information regarding the minors, refrain from using drugs while working with DCFS, comply with requested drug drops, seek a substance abuse evaluation, and follow all recommendations. Father was also required to communicate with his DCFS caseworker, participate in weekly visitation with the minors, obtain suitable housing and provide proof thereof, provide DCFS with medical information about the minors, and ensure access to the minors' school records.

¶ 20                            D. Motions to Terminate Parental Rights

¶ 21          On December 10, 2019, the State filed motions to terminate father's parental rights. The motions alleged father was an unfit parent as described in section 50/1(D)(b) of the Adoption Act (failure to maintain a reasonable degree of interest, concern or responsibility as to the minors'

welfare). 750 ILCS 50/1(D)(b) (West 2018). In support of this contention, the State alleged that father had not attended any visits with his children since July 11, 2019, had not completed any of the recommended services, and had not contributed to any of the educational or medical needs of the minors.

¶ 22    The State's second contention for termination alleged father was unfit as described in section 50/1(D)(g) (failure to protect the minors from conditions within their environment injurious to their welfare). *Id.*, § 50/1D(g). The State alleged that when a DCFS caseworker visited father's home on April 11, 2018, the home lacked furniture and running water and had leaks in the roof and broken glass on the floor.

¶ 23    Next, the State alleged father was unfit as described in section 50/1(D)(k) (habitual drunkenness or addiction to drugs for at least one year immediately prior to the commencement of the fitness proceeding). *Id*., § 50/1(D)(k). The motion alleged that father tested positive for methamphetamine and marijuana in April 2018 and thereafter refused to be tested for the presence of illegal substances in his system on six occasions. Additionally, the State alleged that father did not participate in the substance abuse treatment programs available to him while incarcerated from August 2018 through March 2019.

¶ 24    Lastly, the State alleged father was unfit as described in section 50/1(D)(m)(i) (failure to make reasonable efforts to correct the conditions that were the basis for the removal of the minors during any 9-month period following the adjudication of neglect). *Id*., § 50/1(D)(m)(i). The motion alleged father was currently incarcerated in Henry County, Illinois, with a valid extradition warrant to North Carolina for a parole violation. Father did not show up for three scheduled substance abuse referral appointments and continues to encourage the minors to lie, steal, and cheat during his visits with the children.

6

¶ 25                    E. Motion for Substitution of Judge

¶ 26          On August 13, 2020, father filed a motion for substitution of Judge Patton, alleging that

Judge Patton had a current employment relationship with then circuit clerk, Jacquelyn Oberg, the

mother of the minors' foster mother. Father alleged this relationship compromised Judge

Patton's impartiality and requested the assignment of another judge who did not regularly

preside in the Henry County Circuit Court.

¶ 27          On August 24, 2021, father's motion for substitution was heard by Judge Chickris. Judge

Chickris denied father's motion because father failed to show Judge Patton was actually biased

and failed to show that father suffered prejudice based on Judge Patton's professional history

with Oberg. Although Judge Chickris concluded that the motion to substitute Judge Patton

should be denied, Judge Chickris suggested that defense counsel had an option to ask Judge

Patton to voluntarily recuse himself after considering the provisions of Supreme Court Rule

63(C). Ill. S. Ct. R. 63(C) (eff. Dec. 16, 2020). Rather than requesting Judge Patton to consider

recusing himself, the next time defense counsel appeared before Judge Patton, defense counsel

informed Judge Patton that his client, father, no longer wished to pursue father's request for the

substitution of Judge Patton.

¶ 28                    F. Termination Proceeding: Parental Fitness

¶ 29          On August 27, 2020, the fitness portion of the termination proceeding took place. DCFS

caseworker, Kelly Sanchez, testified that she had been the family's caseworker for the entire

case, which began more than two years earlier, in April 2018. According to Sanchez, the minors

came into DCFS care due to a risk of harm, inadequate shelter, and a lack of supervision. Soon

thereafter, on April 20, 2018, father tested positive for methamphetamine and admitted to

marijuana use.

7

¶ 30    Sanchez testified that father failed to provide DCFS with the minors' educational or medical records, as requested, and failed to obtain stable housing due to his current incarceration. On one occasion, father provided DCFS with incorrect information regarding one of the minors. Sanchez eventually received the correct information through a paternal grandmother.

¶ 31    Father failed to attend three separate appointments for a substance abuse evaluation scheduled by DCFS at times when father was not incarcerated. Similarly, according to Sanchez, father failed to appear for six drug tests she requested at times when father was not incarcerated. Sanchez believed father was currently receiving mental health treatment while incarcerated.

¶ 32    Regarding father's visitation with the minors beginning in 2018, Sanchez testified that after father was initially released from custody, he visited the minors weekly for approximately two months before he was again incarcerated. Sanchez advised the court of her concerns about father's conversations with the minors during visits. Specifically, Sanchez was troubled by father's conversations with the minors that encouraged the minors to break the rules in their foster home. During one of the visits, father boasted that he avoided an arrest for possession of an illegal substance by pretending to have a heart attack. However, father had not attended a visit with the minors since July 9, 2019.[1] Lastly, Sanchez testified that there was a valid outstanding warrant for father's arrest in North Carolina at the time of the hearing.

¶ 33    On cross-examination by father's counsel, Sanchez testified that she reached out to "the prisons" on three separate occasions regarding the possibility of video visits between father and the children. Sanchez explained that father was incarcerated in Henry County, Illinois, North Carolina, and the Lawrence Correctional Center at different times between 2018 and 2020. However, visitation, either by video or in person, did not occur because: (1) DCFS did not have a

_____

[1]Sanchez later testified that father had not attended a visit since July 11, 2019.

8

system in place to pay for the video calls; (2) the rules of the Henry County Jail; and (3) father did not receive permission for any type of visitation from the warden of other correctional facilities. Father reached out to Sanchez, personally, on one occasion about a visit. Otherwise, Sanchez received communications from third parties that father was inquiring about visits with the minors.

¶ 34    Sanchez testified that father could not identify which school the minors attended and was unfamiliar with their individual education programs (IEP). Sanchez described the visits between father and the minors as engaging and therapeutic. Father and the minors would fish and play games in the park.

¶ 35    On cross-examination by the guardian *ad litem* (GAL), Sanchez testified that father regularly wrote letters to the minors. However, father did not ask Sanchez about the minors' physical or mental well-being. Sanchez testified that there was never a nine-month period during the case where father maintained appropriate housing. The court took judicial notice of father's felony cases and/or convictions and the State rested its case.

¶ 36    The fitness portion of the termination proceeding resumed several months later, on October 19, 2020. Father testified that he was currently incarcerated in the Lawrence Correctional Center and would be released on January 1, 2021. Father stated that he attended every scheduled visit with the minors until July 11, 2019. During the visits, father played games with the minors, took them to the park, and took them fishing. Father denied encouraging the minors to misbehave and described Sanchez's testimony on the matter as absurd. Father admitted that he had not attended visits with the minors since July 11, 2019, but explained that his absence was not by choice. Father did not attend visits because Sanchez did not set up the visits. Father testified that he reached out to Sanchez by telephone and by mail regarding visitation but did not

receive any response. Father communicated with the minors by sending the minors letters and pictures.

¶ 37      Father denied that the home where the family resided on or about April 11, 2018, the date the children were removed from mother and father's care, was in deplorable condition. Father testified that a caseworker from the Bethany program came to the home several times a week and had no concerns about the home.

¶ 38      Father felt that DCFS had deprived him of the opportunity to contribute to the medical and educational needs of the minors. Regarding father's alleged drug addiction, father admitted that he used to have a drug problem but has been clean for two years. Father testified that he had 15 certificates of completion relating to various treatment programs. Father provided one drug drop in April 2018, where he tested positive for methamphetamine and marijuana. Father denied refusing to show up for subsequent substance abuse referrals or drug drops and claimed he was never contacted. Father testified that he had spent approximately four months out of incarceration since the children were taken into care in April 2018. Upon his release from custody, father planned to stay at either his father-in-law's home, his friend's home in Kewanee, or with his mother in North Carolina.

¶ 39      On cross-examination, father testified that he became addicted to methamphetamine approximately six months before the case began in April 2018. Father testified that he was self-medicating due to a traumatic experience. Father stated that since April 2018 he had been in jail or prison in approximately six different locations. Father did not seek any form of substance abuse treatment during the time he spent out of custody. Father testified that he did not receive a service plan until he arrived at the Department of Corrections in January 2019. Upon release from custody, father planned to return to work, where he blacktopped driveways and parking

10

lots. Father admitted that he had an outstanding warrant for his arrest in North Carolina but claimed he would be placed on probation due to a plea agreement he had worked out.[2]

¶ 40  Following the arguments of counsel, the circuit court addressed the allegations that father was an unfit parent. The court found the State had met its burden, by clear and convincing evidence, of proving father's: (1) failure to maintain a reasonable degree of interest, concern, or responsibility; (2) habitual drunkenness or addiction to drugs for at least a year preceding the filing of the motions to terminate; and (3) failure to make reasonable efforts to correct the conditions that were the basis for the removal of the children during any nine-month period following adjudication. After finding father was unfit, the circuit court ordered that a best interest report be prepared and the matter was set for a best interest hearing on December 11, 2020.

¶ 41  G. Best Interest Report

¶ 42  DCFS filed a best interest report on December 1, 2020, which contained information on each child. The report documented that father had been incarcerated for significant portions of the 31 months the minors had spent in foster care and opined that father failed to make significant attempts to correct the conditions that brought the minors into foster care. The report concluded that permanency for each child favored the termination of father's parental rights and requested the court to change the minors' permanency goal to adoption.

¶ 43  Additionally, the report provided that all three minors were placed together in the home of the same, licensed, foster parents. The minors' foster parents signed permanency agreements and expressed an interest in adopting the minors. The minors' foster parents intend to keep the minors in contact with their extended family and siblings in North Carolina, a plan which includes regular family vacations to that state.

---

[2]Moments later, father claimed he did not have an active warrant for his arrest in North Carolina, just pending criminal charges.

¶ 44                              1. Best Interest Report (Da.W.)

¶ 45        The report provided that eleven-year-old Da.W. had been in foster care since April 13,

2018. However, Da.W. was moved into specialized foster care on March 22, 2019, due to past

behavioral issues. Da.W.'s needs for physical safety, food, clothing, medical care, and shelter are

met in his current placement. Da.W. feels comfortable in his foster home and has expressed that

he feels normal and safe in the home. Da.W.'s negative behaviors have decreased since his

placement with his current foster family.

¶ 46        Da.W. is currently in sixth grade and is doing well. Da.W.'s foster mother helps Da.W.

complete his homework and cope with his behavioral struggles. Da.W.'s foster mother

participates in school meetings and IEP plans. Da.W. is involved in football and is engaged in

mental health services and counseling. Da.W. wishes to remain with his foster family through

adoption.

¶ 47                              2. Best Interest Report (Dy.W.)

¶ 48        The report provided that nine-year-old Dy.W. had been in foster care since April 13,

2018, and has been with his current foster placement since June 14, 2018. Dy.W.'s needs for

physical safety, food, clothing, medical care, and shelter are met in his current placement. Dy.W.

is doing well in third grade. Dy.W.'s foster mother is an active participant in school-related

meetings and Dy.W.'s IEP plan. Dy.W.'s foster mother is an advocate for Dy.W. when Dy.W. is

struggling with his homework or his behaviors at school. Dy.W. enjoys both baseball and soccer

programs. Dy.W. is comfortable in his home and was very happy when Da.W. came to live in the

home. Dy.W. is engaged in mental health services and counseling. Dy.W. wishes to remain with

his foster family through adoption.

¶ 49                            3. Best Interest Report (S.W.)

¶ 50          The report provided that two-year-old S.W. has been in foster care since April 13, 2018. S.W. was placed with her current foster family on June 25, 2018. S.W.'s needs for physical safety, food, clothing, medical care, and shelter are met in her current placement. The report described S.W. as a growing toddler who is comfortable in her home and enjoys her older siblings. Though S.W. is too young to verbalize her wishes, the report noted that her current placement was the only home she had known since infancy.

¶ 51                   H. Motions to Continue the Best Interest Hearing

¶ 52          On December 3, 2020, father filed a motion to continue the best interest hearing scheduled for December 11, 2020, due to father's lack of transportation from his current place of incarceration and due to an outbreak of Covid-19 in the Department of Corrections. On December 3, 2020, the court conducted a hearing on father's motion to continue and discussed, at length, the court's reluctance to have father appear by electronic means, due to equipment shortcomings. However, the court also observed that the case suffered a "ridiculous" amount of delay. Ultimately, the court granted father's continuance over the GAL's objection. The court set the hearing for January 7, 2021.

¶ 53          On January 4, 2021, father filed a second motion to continue the best interest hearing on the grounds that father had tested positive for Covid-19 within the last week, was unable to attend the hearing in person, and did not have the capacity to participate in the best interest hearing by electronic means. The next day, January 5, 2021, mother filed a motion to continue on the grounds that father and mother had contact after father contracted Covid-19. Mother argued that in the interest of public safety, neither mother nor father could be present in the courthouse. The State agreed to the requested continuance. The court, finding good cause, granted the

13

continuance over the objection of the minors' GAL. The best interest hearing was rescheduled for February 9, 2021.

¶ 54        On February 8, 2021, father's counsel explained to the court that father was in custody in North Carolina and father's counsel voiced his objection to conducting the hearing, scheduled for the next day, in father's absence. The circuit court denied father's request to continue the hearing. The court commented that it had "bent over backwards for [father]. And I'm done. It's time to start bending over backwards for the children in this case."

¶ 55                                   I. Best Interest Hearing

¶ 56        The best interest hearing commenced, as scheduled, on February 9, 2021. Once again, father's counsel made an oral motion to continue the case due to father's absence. The court denied this request.

¶ 57        The State called DCFS caseworker, Kelly Sanchez, to testify. Sanchez testified that the minors all came into foster care in April 2018. Currently, Sanchez visits the minors in their foster home three times per month. Sanchez testified that Da.W. has done very well since moving in with his current foster family. Da.W. gets along with and listens to his foster parents. Da.W. expresses love and gratitude toward his foster parents. Sanchez explained that Da.W. is an anxious child who gets very nervous about upcoming visits with father. Sanchez stated that Da.W. goes along with the visits until they are done. Da.W. does not express disappointment or sadness about not seeing mother and father more often. Da.W. has expressed to his foster parents that he had a rough childhood and is happy in his current home.

¶ 58        Sanchez testified that prior to his current placement, Dy.W. exhibited aggression and defiance. However, Dy.W. has adjusted well to the more structured environment provided by his current foster family. Dy.W. is happy to be with his foster parents and expresses love toward

14

them. Sanchez testified that it was unclear whether Dy.W. wanted to have visitation with father. Dy.W. does not get upset if his parents do not call or visit. Yet, according to Sanchez, Dy.W. asks about upcoming visits more often than Da.W. Dy.W. has expressed that he would like to stay in his foster home with his siblings.

¶ 59 Sanchez testified that S.W., who is currently a toddler, has grown up in her current foster home and calls her foster parents "mom" and "dad." S.W. does not express any disappointment due to reduced visits with father.

¶ 60 Sanchez further explained that the minors' foster parents keep the minors in contact with family in North Carolina. The foster family has also extended invitations for family in Kewanee to see the children. Sanchez believed the foster parents could provide a home and sufficient income to accommodate the minors permanently. The foster parents intended to adopt the minors and had signed the necessary paperwork to do so. Sanchez believed it was in the minors' best interest to terminate father's parental rights.

¶ 61 On cross-examination, Sanchez testified that Da.W. and Dy.W. love to read and play video games. Sanchez believed the foster parents took the minors to visit relatives in North Carolina sometime in 2020 and intended to make visits to North Carolina a yearly occurrence. Sanchez testified that the minors' grandmother in North Carolina was unable to adopt the minors.

¶ 62 Sanchez testified that father had visits with the minors for approximately three months before going to prison. Father attended four to five visits during this time, while missing approximately three visits. Father made inappropriate comments to the minors during visits. However, father showed affection toward the minors, who reciprocated his affection. After father became incarcerated, father did not have visits with the minors because the therapist did not

15

recommend "prison phone calls," and DCFS had no way of setting up prepaid phone calls with the children. Father sent cards to the minors while in prison. Sanchez testified that the minors have a sense of love, attachment, and security with their current foster family.

¶ 63        On redirect examination, Sanchez testified that the foster parents encourage the minors to be involved in various activities. The minors are happy in school as well. Sanchez stated that the minors were not in school for over a year prior to the minors' transition into foster care.

¶ 64        Foster mother testified that she lives with her husband and the minors in Galva, Illinois. Foster mother described the layout of the family home. Foster mother explained that Da.W. and Dy.W share a bedroom, while S.W. has her own room. Da.W. is currently in sixth grade and struggles with reading. However, Da.W. is a "math whiz" and is on the honor roll. Da.W. played baseball, basketball, and football in the past but has not participated recently due to Covid-19. Da.W. is comfortable in the home and has started calling his foster parents "mom" and "dad."

¶ 65        Foster mother testified that Dy.W. is currently in third grade. Dy.W. struggles with reading and grammar but is also a "math whiz" who is on the honor roll. Dy.W. participates in sports and feels safe in the home. Dy.W. exhibits bad behavior following visits with his biological parents, which includes stealing from neighbors and smoking. Dy.W. exhibits anxiety during the days before and after visits. Foster mother is unsure whether Dy.W. wants to attend visits with father but knows that Da.W. does not.

¶ 66        Foster mother testified that S.W. currently loves attending preschool. S.W. has been with her foster parents since she was six months old and calls her foster parents "mom" and "dad." Foster mother revealed that the minors have four other siblings, three of whom live in North Carolina. Foster mother encourages the children to have contact with their siblings and other family members.

16

¶ 67        Foster mother indicated that father sends pictures he draws to the minors, which the children enjoy. However, foster mother does not believe the minors miss father. Foster mother has discussed adoption with the minors in a kid-friendly way. The foster parents have signed a letter of intent to adopt the minors.

¶ 68        On cross-examination, foster mother revealed that the minors are active in the community and attend church. The foster family lives near a park, where the minors enjoy ice skating and spending time with friends. Foster mother stated that she would continue visits with father if it is therapeutically beneficial to the minors.

¶ 69        Mother testified and briefly recounted some history concerning Da.W. and Dy.W.'s schooling. Mother testified that Da.W. loves her to death and told her he wanted to come home. Dy.W. also wants to return home to his biological mother and father but has expressed his desire to have some sort of relationship with his foster parents. Da.W. and Dy.W. indicated to mother that they are not allowed to discuss mother and father in the foster home. Prior to going into placement, the minors had friends. Father's mother, who lives in North Carolina, is willing to take the minors. Mother testified that she and father are willing to sign their parental rights over to the grandmother, if necessary. Mother loves her children and believes it is in their best interest to stay with mother and father and their other siblings.

¶ 70        On cross-examination, mother testified that she spent about 70 percent of the last three years in custody. Mother admitted that a petition to revoke her probation was currently pending. Mother believed the minors could stay with her at her father's home, where the minors would have the upstairs to themselves.

¶ 71        Mother also testified on cross-examination that father is affectionate toward the minors during visits and that the minors are attached to their father. Father takes the children to the park

17

for visits. Father has Da.W. and Dy.W. on his lap while they fish. Father loves the minors with all of his heart. Mother testified that father was involved in several programs during his incarceration and defense counsel presented several certificates of completion to the court. Mother described father as "anti-drug" and stated that he just wanted to get the children home.

¶ 72    In the future, mother and father plan to live in North Carolina. Mother testified that if the children are unable to be with mother and father, the children would prefer to be with grandma and grandpa.

¶ 73    Counsel for father argued during closing argument that as the result of the programs father had completed during incarceration, father had improved himself immensely. Counsel stated that the pandemic limited father's ability to have contact with his children, but father has always attempted to stay in contact with them. Counsel believed father could provide a stable home environment for the children upon his release.

¶ 74    Following the arguments of counsel, the circuit court applied the best interest factors outlined in section 1-3(4.05) of the Act and found that the factors favored the termination of father's parental rights. 705 ILCS 405/1-3(4.05) *et seq.* (West 2020). Citing strong evidence, the court found the State met its burden of proof, by a preponderance of the evidence, and that termination of father's parental rights was in the best interest of the children.

¶ 75    Father filed a timely notice of appeal on March 12, 2021.

¶ 76                                II. ANALYSIS

¶ 77    Father opens his appeal by challenging Judge Chickris's denial of father's motion for substitution of judge based on Judge Patton's working relationship with former circuit clerk, Jacquelyn Oberg, the mother of the minors' foster mother.

18

¶ 78        Our review of the record reveals that father's motion to substitute judge, and the arguments in support of this motion, cannot be described as anything other than half-hearted. For instance, father's motion to substitute does not specify whether father sought Judge Patton's substitution as a matter of right or for cause.[3] See 735 ILCS 5/2-1001(a) *et seq.* (West 2020) (providing that section 2-1001 of the Code of Civil Procedure contemplates two distinct actions for substitution, those as a matter of right and those for cause). See also *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 28.

¶ 79        Counsel for father indicated during the hearing that the motion for substitution was "*essentially* for cause in this case." (Emphasis added.) However, father's motion did not contain any allegations describing the existence of judicial bias and what prejudice, if any, father suffered. See *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 30 (holding that the movant must establish personal bias and/or actual prejudice to obtain a substitution of judge for cause).

¶ 80        In addition, after Judge Chickris denied the motion to substitute Judge Patton, father's counsel stated for the record that father no longer wished to pursue Judge Patton's substitution. Father also failed to challenge Judge Chickris's ruling in a posttrial motion. Thus, father's argument on appeal is forfeited and arguably waived. However, in the interest of a thorough analysis due to the significance of the parental rights at stake in the instant appeal, we exercise our authority to review father's contention of error based on Judge Chickris's ruling.

¶ 81        Here, Judge Chickris conducted a hearing to determine whether cause for substitution existed in accordance with section 2-1001(a)(3)(iii) of the Code of Civil Procedure. 735 ILCS 5/2-1001(a)(3)(iii) (West 2020). Although the motion was insufficient on its face, out of an abundance of caution, Judge Chickris considered the merits of an inartfully drafted and vaguely

---

[3]Section 2-1001(a)(3)(ii) provides that applications for substitution for cause are to be brought by petition rather than by motion. 735 ILCS 5/2-1001(a)(3)(ii) (West 2020).

19

worded motion for substitution. Judge Chickris found that father failed to present any evidence of actual prejudice attributable to Judge Patton. See *People v. Klein*, 2015 IL App (3d) 130052, ¶ 89 (explaining that the appearance of impropriety is not equivalent to actual prejudice). Similarly, father presents no evidence on appeal of Judge Patton's alleged bias or any decision from Judge Patton that was anything other than based on the facts of record and the application of the law to those facts.

¶ 82    A reviewing court will not reverse the circuit court's decision on a petition to substitute a judge for cause unless the court's finding was against the manifest weight of the evidence. *In re J.D.*, 332 Ill. App. 3d 395, 404 (2002). In this case, Judge Chickris's finding could not be against the manifest weight of the evidence because father's motion to substitute Judge Patton was premised on mere speculation, without any specific reference to events revealing actual judicial bias and/or prejudice. Thus, we affirm Judge Chickris's decision denying father's motion to substitute Judge Patton.

¶ 83                    A. Denial of Oral Motions to Continue

¶ 84    Next, father challenges Judge Patton's decision to deny father's oral requests to continue the best interest hearing. Father argues the denial of his motions to continue resulted in a palpable injustice and violated father's due process rights. The State argues the children's best interest favored conducting the best interest hearing in father's absence. We agree with the State's position.

¶ 85    The decision to deny a requested continuance will not be disturbed unless it resulted in a palpable injustice or constituted an abuse of discretion. *Doe v. Parillo*, 2020 IL App (1st) 191286, ¶ 39. An abuse of discretion occurs where the circuit court's ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would render the same ruling. *Id*.

20

¶ 86 As recounted in the facts above, the court noted father's absence from several key hearings and granted father two continuances related to Covid-19 before the best interest hearing scheduled for February 9, 2021. It is undisputed that father was unable to be present at the February 9, 2021, best interest hearing because he had once again been incarcerated in North Carolina. We are not persuaded by father's unsupported assertion that the continuance should have been granted because there was a possibility that father might be released from custody soon after February 9, 2021. Father suggests in his brief that a "further continuance *could have been,* perhaps, one more month." (Emphasis added.) Simply put, the circuit court had no assurance that father would have or could have been present in court if the court had granted, for instance, a continuance of one month.

¶ 87 Further, father argues on appeal that there was not a pressing need to conduct the best interest hearing on February 9, 2021. We are not persuaded by father's argument. The record reveals that the minors' GAL objected to every requested continuance, beginning in December 2020, for good reason. Following a finding of parental unfitness, the focus of the proceeding must shift to the children. *In re Davon H.*, 2015 IL App (1st) 150926, ¶ 75. At the time of the best interest hearing, the minors had been in foster care for nearly three years (April 13, 2018 – February 9, 2021). As the court stated, the children's need for permanence and stability at this point in the proceeding was the primary reason for the denial of father's request for a continuance. We cannot say the circuit court abused its discretion under these circumstances.

¶ 88                                  1. Due Process Violation

¶ 89 Next, we turn to father's claim that the circuit court's denial of his requests for continuances served to deprive father of his due process rights. Indeed, we agree that parents have a fundamental liberty interest in maintaining a parental relationship with their children. *In*

21

*re Vanessa C.*, 316 Ill. App. 3d 475, 481; *In re J.J.*, 201 Ill. 2d 236, 267 (2002). However, in limited circumstances, the State may interfere with a parent's fundamental right when it becomes necessary to protect the health, safety, and welfare of the children. *In re D.T.*, 2017 IL App (3d) 170120, ¶ 23. Ultimately, due process is achieved in this context through compliance with the Juvenile Court Act of 1987 and fundamental fairness. *Id*. Appellate courts review potential due process violations *de novo*. *In re J.M.*, 2020 IL App (2d) 190806, ¶ 37.

¶ 90        With these principles in mind, we turn to the *Mathews* factors to weigh father's due process rights. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). The *Mathews* factors include a consideration of: (1) the private interest affected; (2) the risk of erroneous deprivations of a protected interest and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the financial and administrative burdens. *Id*.; *In re M.B.*, 2019 IL App (2d) 181008, ¶ 20.

¶ 91        Based on this record, the first *Mathews* factor favors father, due to the strength and constitutional nature of parental rights. Regarding the second *Mathews* factor, the denial of father's request for a continuance did not increase the risk of an erroneous deprivation of father's rights. Critical to our determination is the fact that father's counsel vigorously represented father's interests at the best interest hearing. Father's counsel elicited testimony regarding father's current circumstances, wishes, and the children's relationship with father. Father's counsel also presented a spirited argument on father's behalf.

¶ 92        Regarding the final *Mathews* factor, the government has an interest in reducing the cost and burden of prolonged wardship and/or termination proceedings. See *In re D.T.*, 212 Ill. 2d 347, 365 (2004). This record shows that the family's case lingered in the circuit court for nearly three years. During this time, the State assumed the financial responsibility of caring for all three

22

children. After three years, there was no clear end in sight. Finally, and most importantly, following the court's unfitness finding, the focus of the proceeding shifted to the children, and father's presence and participation in the best interest hearing became less relevant.

¶ 93     In cases such as this, the court must balance parental rights against a child's need for stability. As a matter of public policy, it cannot be disputed that children have a strong interest in residing in a safe and nurturing home, an environment that provides a sense of permanence and continuity. Based on this record, we commend the circuit court for liberally allowing extensions of time until the best interest of the children became the primary issue for the court's resolution. After the finding of unfitness, the circuit court justifiably shifted its approach from accommodating the interests of the biological parents to accommodating the interests of the children.

¶ 94     For the foregoing reasons, we hold that no due process violation occurred in this case.

¶ 95                                        B. Parental Fitness

¶ 96     Next, father argues the court erred when it found father unfit. Parental termination proceedings are initiated by the filing of a termination petition pursuant to the provisions of the Act. 705 ILCS 405/2-13 (West 2020). Thereafter, a parent's rights may be terminated upon clear and convincing evidence that the parent is unfit under any of the grounds enumerated in section 1(D) of the Adoption Act. *In re D.D.*, 196 Ill. 2d 405, 417 (2001); 750 ILCS 50/1(D) (West 2020). A circuit court's fitness determination will not be reversed on appeal unless the ruling is against the manifest weight of the evidence. *Id.* A ruling is against the manifest weight of the evidence where the opposite conclusion is clearly evident. *Id.*

¶ 97     In this case, the circuit court found father unfit by clear and convincing evidence on several statutory grounds, including: (1) failure to maintain a reasonable degree of interest,

23

concern or responsibility as to the minors' welfare; (2) habitual drunkenness or addiction to drugs for at least one year immediately prior to the commencement of the unfitness proceeding; and (3) failure to make reasonable efforts to correct the conditions that were the basis for the removal of the minors during any nine-month period following the adjudication of neglect. 750 ILCS 50/1(D)(b), (k), and (m)(i) (West 2018). However, it is well established that a court may find a parent unfit if just one statutory ground is proven. *In re Gwynne P.*, 215 Ill. 2d 340, 349 (2005). Thus, we will affirm the circuit court's fitness determination if even a single ground for unfitness is supported by the record.

¶ 98     Regarding father's failure to maintain a reasonable degree of interest, concern or responsibility as to the minors' welfare, the court found that father's arrests in multiple counties and/or states hindered father's ability to participate in the children's lives. The court stated: "[i]f you want to see your children, be part of your children's lives and get your children back out of DCFS custody, it's not reasonable to repeatedly commit crimes and get arrested." Regarding this specific statutory ground, the court also found that father failed to provide DCFS with basic educational and medical information about the children and pointed out the testimony that the children did not appear to be in school at certain times.

¶ 99     The record lends full support to the circuit court's findings. The testimony did not establish that father completely failed to have contact with his children. Nonetheless, father was repeatedly incarcerated during the pendency of this case, demonstrating father's lack of concern for the well-being of his children. At the time of the fitness hearing on August 27, 2020, father had not seen the children in more than one year (July 9, 2019 – August 27, 2020). The testimony also established, that while out of custody, father failed to attend three separate appointments for

24

a substance abuse evaluation and six requested drug drops. Father's refusal to comply with the requirements of the service plan reveals that father had little interest in reunification.

¶ 100 The State astutely surmises, that even if it could be found that father exhibited a reasonable degree of interest, he could not be found to have maintained a reasonable degree of responsibility. Father's own choices and behaviors speak for themselves. Accordingly, we cannot say the court's finding that father failed to maintain a reasonable degree of interest, concern or responsibility as to the minors' welfare was against the manifest weight of the evidence. Further, though not required to affirm the circuit court's fitness determination, we would also hold that the evidence presented at the fitness hearing supports the court's findings of unfitness on the additional statutory grounds.

¶ 101 C. Best Interest Determination

¶ 102 Following a finding of parental unfitness, the court's focus must shift to the child's interest in "a stable, loving home life." *In re D.T.*, 212 Ill. 2d at 364. At this stage, the State's burden of proof lessens to a preponderance of the evidence. *Id*. at 366-67. When considering whether the termination of parental rights serves the child's best interest, court's consider: (a) the physical safety and welfare of the child, including food, shelter, health, and clothing; (b) the development of the child's identity; (c) the child's background and ties, including familial, cultural, and religious; (d) the child's sense of attachment; (e) the child's wishes and long-term goals; (f) the child's community ties; (g) the child's need for permanence; (h) the uniqueness of every family and child; (i) the risks attendant to entering and being in substitute care; and (j) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) et seq. (West 2020). A circuit court's finding that the termination of parental rights was in the child's best interest will not be disturbed on appeal unless it is contrary to the manifest weight of the

25

evidence. *In re Parentage of J.W.*, 2013 IL 114817, ¶ 55. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Best v. Best*, 223 Ill. 2d 342, 350 (2006).

¶ 103                                                    1. Da.W.

¶ 104       The best interest report and the testimony at the best interest hearing established that eleven-year-old Da.W. had been in foster care since April 13, 2018. Da.W. is currently placed in a foster home with his siblings. By all accounts, Da.W. experienced behavioral issues in prior placements, which decreased when Da.W. was placed in his current foster home. Da.W. feels comfortable in his foster placement, where his needs for physical safety, food, clothing, medical care, and shelter are met. Da.W.'s foster parents intend to keep Da.W. in contact with his extended family and other siblings. Da.W. excels in mathematics and receives support from his foster mother when he struggles in school. Da.W. also engages in sports and community activities.

¶ 105       We recognize that the court heard conflicting testimony regarding Da.W.'s permanency wishes. We do not find the record sufficient to weigh the credibility of this testimony here. We are, however, encouraged that Da.W. has recently begun calling his foster parents "mom" and "dad." Perhaps most importantly, Da.W.'s foster parents have signed permanency agreements and have expressed interest in adopting Da.W. Da.W.'s current foster placement provides Da.W. with the permanency, structure, and stability Da.W. deserves going forward. To this end, we affirm the circuit court's termination of father's parental rights as to Da.W.

¶ 106                                    2. Dy.W.

¶ 107          The best interest report and the testimony at the best interest hearing established that nine-year-old Dy.W. had been in foster care since April 13, 2018. Dy.W. is currently placed in a foster home with his siblings. Dy.W. has been with his current foster placement since June 14, 2018. Dy.W. exhibited aggression and defiance prior to his current placement but has adjusted well to the structured environment his current foster family offers. Dy.W.'s needs for safety, food, clothing, medical care, and shelter are met in his current placement. Much like Da.W., Dy.W. excels in mathematics and receives support from his foster mother when he struggles in school. Dy.W. also engages in sports, community activities, mental health services, and counseling.

¶ 108          The court heard conflicting testimony regarding Dy.W.'s wishes for permanency, and we do not seek to parse Dy.W.'s thoughts here. Dy.W. is comfortable in his home and expresses love for his foster parents. Dy.W.'s foster parents have signed permanency agreements and have expressed interest in adopting Dy.W. Dy.W.'s current foster placement provides Dy.W. with the opportunity to be close to his siblings and provides the structure Dy.W. needs to improve his negative behaviors. For these reasons, we affirm the circuit court's termination of father's parental rights as to Dy.W.

¶ 109                                    3. S.W.

¶ 110          The best interest report and the testimony at the best interest hearing revealed that two-year-old S.W. has been in foster care since April 13, 2018, and has been with her current foster placement since June 25, 2018. S.W. has lived with her foster family since infancy in the only home she has ever known. S.W. is a growing toddler who enjoys having her older brothers in the

home. S.W. calls her foster parents "mom" and "dad." S.W.'s needs for food, shelter, health, and clothing are met in her current placement.

¶ 111 Though S.W. is too young to verbalize her permanency wishes, S.W., like any child, thrives when afforded permanence and stability, both of which this foster family is providing for S.W. We affirm the circuit court's termination of father's parental rights as to S.W.

¶ 112 In conclusion, we are encouraged by this foster family's willingness to sustain the children's ties to their other siblings and family members. Courts prefer to place siblings together, whenever possible, which is the case here. We believe the children's best interests are served in their current placement and affirm the termination of father's parental rights.

¶ 113 III. CONCLUSION

¶ 114 The judgment of the circuit court of Henry County is affirmed.

¶ 115 Affirmed.